**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD NEVAREZ, | Case No. CV 14-9494 (SS) |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Plaintiff Edward Nevarez ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying his application for Disability Insurance Benefits. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is REVERSED and

\\

the action is REMANDED for further proceedings consistent with this decision.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Insurance Benefits ("DIB") in April 2011. (Complaint at 1; see also Administrative Record ("AR") 20). In the application, Plaintiff alleged a disability onset date of August 28, 2008. (AR 20). The agency denied Plaintiff's application initially on July 26, 2011, and upon reconsideration on October 19, 2011. (Id.). On November 9, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Id.). Plaintiff testified before the ALJ, Michael J. Kopicki, on March 11, 2013. (Id.). On March 29, 2013, the ALJ issued a decision denying Plaintiff DIB. (Complaint at 1-2). Plaintiff timely requested review of the ALJ's decision, which the Appeals Council denied on October 27, 2014. (Id. at 2). Plaintiff then filed an action with this Court on December 10, 2014. (Case No. 14-9494 SS).

## III.

### FACTUAL BACKGROUND

Plaintiff was born on March 24, 1960. (AR 77). Plaintiff was forty-eight years old at the time of his alleged disability onset date, and fifty-two years old at the time of his hearing before the ALJ. (AR 77, 85). Plaintiff completed two years of

2

college and communicates in English. (AR 37,85). Plaintiff previously worked as a project manager, film librarian and a film vault supervisor. (AR 37, 86-89, 91). However, Plaintiff was laid off from his most recent job in August 2011. (AR 99). Plaintiff alleges an onset of disability due to residual effects from a stroke and blood clotting disorder treated with blood thinners; rheumatoid arthritis; neck, shoulder and back pain; cardiac issues following two open heart surgeries; headaches; and depression and anxiety. (AR 93, 226, 251, 254, 262). In the Disability Report accompanying the Disability Insurance Benefits Application, Plaintiff lists "stroke," "rheumatoid arthritis," "neck, shoulder, back pain," and "open heart surgery" as physical and mental conditions limiting his ability to work. (AR 226).

**A.   Medical History and Treating Doctors' Opinions**

    **1.   Eric Fernandez, M.D.**

Plaintiff first saw his primary care physician, Eric Fernandez, M.D., who was associated with the Facey Medical Group, on February 20, 2009. (AR 381). Dr. Fernandez noted that Plaintiff had had open heart surgery in April 2008 and had water near the heart. (AR 381). Dr. Fernandez assessed tension headaches, elevated alkaline phosphatase levels, aortic valve repair, moderate single episode major depression and transient ischemic attack. (AR 383). Dr. Fernandez also determined Plaintiff had sinusitis and prescribed him various medicines. (Id.).

On January 26, 2010, Plaintiff had staples removed, which had been placed to treat a head injury that occurred when he fell from a ladder. (AR 374). Plaintiff also had a routine physical exam. (Id.). Dr. Fernandez noted that Plaintiff had previously had an abdominal wall repair, right shoulder surgery, aortic valve replacement surgery and a "[second] open heart surgery due to aneurysm." (Id.).

In January 2011, Plaintiff had a routine physical examination and said he was "generally feeling well." (AR 367). The physical examination showed normal results. (AR 369). Dr. Fernandez ordered an echocardiogram for April and recommended that Plaintiff follow up in one year. (Id.).

Dr. Fernandez examined Plaintiff again on April 28, 2011. (AR 422). After performing a physical exam, Dr. Fernandez noted that Plaintiff's heart rate, rhythm and sounds were normal. (AR 423). Plaintiff's breathing showed no signs of wheezing, rhonchi, rales or crackles. (Id.). Dr. Fernandez assessed tension headaches, "mildly exacerbated" asthma, "open wound of the scalp," hyperlipidemia and transient ischemic attack. (Id.). Dr. Fernandez noted that Plaintiff's recovery from a single episode of major depression and anxiety disorder was improving. (Id.).

In October 2011, Plaintiff visited Dr. Fernandez complaining of several symptoms, including knee pain, elbow pain, trouble with balance, headaches and nausea. (AR 514-515). Dr. Fernandez

assessed improving anxiety disorder, hyperlipidemia, knee joint pain and "benign prostatic hypertrophy." (AR 515). Dr. Fernandez prescribed Zolpidem Tartrate, Citalopram Hydrobromide and Naprosyn. (AR 516). Furthermore, he ordered Plaintiff to do pendulum swing exercises, ice his knee and elevate his leg at least three times a day. (Id.).

In January 2012, Plaintiff reported shortness of breath, headaches and left arm pain, and Dr. Fernandez assessed knee joint pain, gallbladder polyp, onychomycosis, moderate single episode major depression and tension headaches. (AR 510-512). He also documented a normal examination of Plaintiff's heart and lungs. (Id.). He ordered Plaintiff to discontinue taking Zolpidem Tartrate and to renew his prescription for Citalopram Hydrobromide. (AR 513).

On February 22, 2012, Plaintiff sought treatment for chest pain, shortness of breath and nausea. (AR 508). Dr. Fernandez stated that examination of Plaintiff's chest showed his heart was "reproducible to palpita[t]ions." (Id.). He also assessed hyperlipidemia, knee joint pain, anxiety disorder, chest pain and nausea with vomiting. (AR 509). Dr. Fernandez requested an electrocardiogram and a knee x-ray to be taken the same day. (Id.). He noted that Plaintiff should switch to Zoloft for his depression and Demerol for his tension headaches. (AR 508).

On April 2, 2012, Plaintiff complained of right groin pain radiating to his right knee. (AR 506). Dr. Fernandez observed

1  an "obvious swelling of the right knee with generalized
2  tenderness worse on the posterior aspect of the knee." (Id.).
3  Dr. Fernandez gave Plaintiff a morphine injection and prescribed
4  Tramadol to be taken as directed. (Id.). If the pain and
5  swelling did not improve within forty-eight hours, Plaintiff was
6  instructed to go to urgent care or follow up with Dr. Fernandez.
7  (Id.).

8

9      In August 2012, Plaintiff visited Dr. Fernandez to "follow
10 up on medications." (AR 502). Dr. Fernandez noted Plaintiff's
11 history of aortic valve replacement and examined Plaintiff's
12 heart. (AR 502-503). Dr. Fernandez also noted Plaintiff's
13 history of chest pain "reproducible to palpitations," and that
14 Plaintiff's cardiac examination was normal and his valve
15 replacement was stable on Coumadin. (Id.). Dr. Fernandez
16 assessed tension headaches, anxiety disorder, bunion, moderate
17 single episode major depression, and aortic valve repair. (AR
18 504). He noted that Plaintiff had not been taking the Zoloft he
19 prescribed in February for depression. (AR 502). Dr. Fernandez
20 ordered that Plaintiff discontinue taking Lipitor, Fenofibrate,
21 Citalopram Hydrobromide, Hydrocodone-Acetaminophen, Promethazine
22 and Flovent. (AR 504).

23

24     In November 2012, Plaintiff sought treatment for a bunion on
25 his left foot related to an old injury to his toe. (AR 518).
26 The report indicated that Plaintiff had endured "moderate dull
27 nonradiating pain in the left foot bunion site for the last 2
28 years." (Id.). Dr. Fernandez assessed onychomycosis and bunion.

1   (AR 566).  Plaintiff was ordered to use Cielopirox.  (Id.).  In

2   addition, Dr. Fernandez ordered a foot x-ray the same day and

3   discussed the results with Plaintiff.  (AR 518-520).

4

5       **2.   Donald Huey, M.D.**

6

7       On July 2, 2008, Dr. Huey, who was also associated with the

8   Facey Medical Group, examined and treated Plaintiff for body

9   ache, depression, and constant mild headache and conducted a

10  medication follow-up.  (AR 304).  He assessed tension headache,

11  aortic valve repair and moderate single episode major depression.

12  (AR 305).  He ordered Plaintiff to take Warfarin and Citalopram

13  Hydrobromide and to renew his Alprazolam prescription.  (Id.).

14  He ordered Plaintiff to follow up in one month.  (Id.).

15

16      On August 20, 2008, Dr. Huey examined Plaintiff because

17  Plaintiff woke up with blood in his mouth and suffered from a

18  headache.  (AR 298).  Dr. Huey noted that Plaintiff was

19  "depressed but not suicidal."  (Id.).  He recommended that

20  Plaintiff take Tylenol for the headaches and come back to see him

21  in seven to ten days.  (Id.).

22

23      Dr. Huey examined Plaintiff again on August 28, 2008, the

24  disability onset date, for a routine follow up exam.  (AR 296).

25  Plaintiff complained of depression, anxiety, recurring nausea and

26  headaches for the past week.  (Id.).  He told Dr. Huey he was

27  "worried [he] might lose [his] job due to [his] medical

28  condition."  (Id.).  Dr. Huey assessed nausea, tension headaches,

7

aortic valve repair and moderate single episode major depression. (AR 297). He ordered Plaintiff to resume taking Alprazolam and to take Promethazine and Citalopram Hydrobromide. (Id.). Furthermore, he recommended that Plaintiff see a therapist within two weeks. (Id.).

### 3.  Grace Kim, M.D.

Grace Kim, M.D., an urgent care physician associated with the Facey Medical Group, examined Plaintiff on September 28, 2008, after Plaintiff complained of bleeding from the left ear and from a scratch mark on his chest. (AR 295). Due to coagulopathy, Dr. Kim recommended that Plaintiff's Coumadin dose be held and that he follow up with his primary care physician if there were any problems. (Id.).

### 4.  Brook Michaels, M.D.

In September 2010, Plaintiff was seen by Dr. Brook Michaels, of the Facey Medical Group, and reported a two- to three-day history of excruciating back pain. (AR 371). Dr. Michaels observed that Plaintiff had undergone aortic valve repair. (AR 372). In addition, he assessed muscle spasm, a history of essential hypertension and excessive anticoagulation on Coumadin. (Id.). He prescribed Oxycodone-Acetaminophen, Cyclobenzaprine and Warfarin Sodium. (Id.).

\\

\\

1     **5.**   **Khoa Nguyen, M.D.**

2

3     In May 2011, Plaintiff had bumped his elbow against a sink

4 and complained of swelling, pain and decreased range of motion.

5 (AR 420).   Dr. Khoa Nguyen, M.D., of the Facey Medical Group,

6 noted that Plaintiff took Coumadin.   (Id.).   He performed a

7 physical exam and ordered an x-ray of Plaintiff's elbow.   (AR

8 421).   He assessed a "contusion of the left elbow with intact

9 skin surface" and prescribed Hydrocodone-Acetaminophen.   (Id.).

10 He instructed Plaintiff to ice the area and wear an elbow

11 support/sling.   (Id.).

12

13     **6.**   **Christopher Hougen, M.D.**

14

15     In July 2011, Plaintiff sought treatment for a bee sting on

16 his right forearm.   (AR 418).   Dr. Christopher Hougen, of the

17 Facey Medical Group, assessed a "nonvenomous insect bite" and an

18 "infected nonvenomous insect bite." (AR 419).   He gave Plaintiff

19 Rocephin and Benadryl injections and prescribed antibiotics.  (AR

20 418).   He asked Plaintiff to follow up in a day or two for

21 reevaluation.   (Id.).

22

23 **B.**   **Non-Examining Physicians' Opinions**

24

25     **1.**  **Michael Wallack, M.D.**

26

27     On June 7, 2011, Canyon Medical Group's Dr. Michael S.

28 Wallack, an internist, conducted a one-day Complete Internal

Medicine Evaluation of Plaintiff at the request of the Department of Social Services.  (See AR 135-136, 402-409).  Dr. Wallack's physical examination indicated that Plaintiff had an audible prosthetic valve and a "trace of aortic insufficiency," but "[n]o arrhythmia."  (AR 406).  Dr. Wallack also noted that Plaintiff had "no tenderness to palpitation in the midline or paraspinal area."  (Id.).  The evaluation also indicated that Plaintiff could stand on his heels and toes and perform a tandem gait.  (AR 407).  Dr. Wallack also reported that Plaintiff could drive and pick up his children from school.  (AR 404).  Dr. Wallack noted that Plaintiff was taking Citalopram to manage his illnesses.  (Id.).

Ultimately, Dr. Wallack concluded that Plaintiff should be able to occasionally lift fifty pounds and frequently lift twenty-five pounds.  (AR 408).  Dr. Wallack also indicated that Plaintiff should be able to stand and walk for six to eight hours.  (Id.).  Dr. Wallack determined that Plaintiff had no environmental, visual, manipulative or communicative limitations.  (Id.).  In his opinion determining that Plaintiff was not disabled, the ALJ assigned "substantial" weight to Dr. Wallack's opinion, noting that he found it was "better supported than the opinion of Dr. Fernandez."  (AR 37).

**2. Disability Determination Service Medical Consultants**

During a Residual Functional Capacity assessment, DDS medical consultants determined that Plaintiff should be able to

occasionally lift twenty pounds and frequently lift ten pounds. (AR 139).  They also noted that Plaintiff should be able to stand and walk for six hours in an eight-hour work day.  (Id.).  The DDS consultants determined that Plaintiff had no environmental, visual, manipulative or communicative limitations.  (AR 140). The ALJ assigned "greater" weight to the DDS consultants' opinion than to Dr. Wallack's opinion.  (AR 37).

### 3.  C. Scott, M.D.

On October 19, 2011, a DDS physician, Dr. C. Scott, reviewed the case on reconsideration and concluded that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently, but could stand for slightly less than two hours only.  (AR 151).

### B.  Vocational Expert Testimony

Vocational Expert ("VE") Elizabeth Ramos testified at the ALJ Hearing regarding the existence of jobs that Plaintiff could perform given his functional limitations.  (AR 123).  The VE identified Plaintiff's past work as a "film librarian, movies," with a Dictionary of Occupational Titles ("DOT") listing of 222.367-026, and his past work as a "film vault supervisor" with a DOT listing of 222.137-010.  (Id.).  The VE explained that both occupations constitute "light" work.  (Id.).

\\

\\

The ALJ posed two hypotheticals to the vocational expert. First, the ALJ described an individual with a "medium" Residual Functional Capacity ("RFC") and asked if the individual could perform Plaintiff's past relevant work.[1]  (AR 124-125).  The VE opined that such a person would be able to perform Plaintiff's past work as the DOT describes it, but not as the Plaintiff performed.  (Id.).  The ALJ then asked the VE whether the hypothetical individual could perform work as a film librarian or film vault supervisor if he were limited to "detailed or simple instructions or tasks."  (AR 166).  The VE concluded that the individual could not perform Plaintiff's past relevant work as a film librarian or film vault supervisor.  (Id.).  However, the VE stated that such an individual could find work as an "assembler, small products," with 300,000 jobs nationally and 2,000 locally, or as a bonding machine operator, with 100,000 jobs nationally and 1,000 locally. (AR 126-127).  Finally, the ALJ asked the VE whether the same individual could find work if he had problems lifting up to twenty pounds; using the hands, fingers, and arms for grasping, turning, twisting objects, fine manipulation and reaching; and attending work without missing more than four days

---

[1]  The ALJ described an individual between 48 and 52 years old, who has a high school education, two years of college, and relevant work experience, is limited to a range of light work including occasionally lifting and/or carrying 20 pounds, and frequently lifting and/or carrying 10 pounds. (AR 124).  The ALJ further stated that the individual can stand and/or walk for about six hours in an eight hour work day with normal breaks, and sit for about six hours of an eight hour work day with normal breaks.  (Id.).  The ALJ also stated that the individual should no more than occasionally climb ramps, stairs, ladders, ropes, or scaffolds, balance, crouch, or crawl, and should also avoid concentrated exposure to dust, fumes, gases, and other similar environmental pollutants.  (Id.).

1    of work per month as a result of impairments or treatment. (AR

2    127).  The VE found that such a person could not find employment

3    of any sort.  (Id.).

4

5        Plaintiff's attorney asked whether the hypothetical

6    individual, who would need to take unscheduled fifteen-minute

7    breaks every thirty minutes to an hour and would need to sit

8    quietly during those breaks, could perform the work identified.

9    (AR 129-130).  The VE opined that the individual could not

10   perform the work if the unscheduled breaks were taken on a daily

11   basis.  (Id.).  Plaintiff's attorney then asked if Plaintiff

12   would be able to perform the work identified, if, as Plaintiff

13   had testified, he could walk only half a block before needing to

14   stop and sit for only thirty to forty minutes at a time, could

15   lift only up to twenty-five pounds occasionally and ten pounds

16   frequently, and could stand up only up to twenty minutes at a

17   time.  (AR 129-130).  The VE found that Plaintiff could not

18   perform such work.  (AR 130).

19

20   C.   **Plaintiff's Testimony**

21

22       At the ALJ hearing, Plaintiff testified that he went through

23   "two major open heart surgeries."[2]  (AR 93).  Plaintiff was in

24

25   [2] Plaintiff was born without a valve, so he had heart surgery to
     have a human valve inserted. (AR 133). However, the surgeon did
26   not connect the nerve to the valve, so, after about ten years,
     the valve split open. (AR 134). Plaintiff had to have another
27   heart surgery. (AR 135-136). During his second surgery,
     Plaintiff's transplant was replaced with a metal valve. (AR
28   135).

                                   13

pain and suffered from tiredness and shortness of breath for a long time after his second heart surgery, but the pain and symptoms eventually subsided. (AR 95-96). Plaintiff also noted that he continues to take several medications for his heart to stabilize his blood. (AR 96-97). Plaintiff testified that his primary care physician, Dr. Eric Fernandez, examined him sometime after his second heart surgery and determined that Plaintiff had improved, but was "not where [he's] supposed to be." (AR 97).

Plaintiff further testified that, sometime after August 28, 2008, he suffered his first transient ischemic attack (a "mini stroke"). (AR 99-100). Plaintiff testified that he has suffered subsequent mini strokes, and as a result, had lost feeling in one of his toes. (AR 100). Plaintiff testified that after all the medical complications he suffered, Dr. Fernandez altered his Coumadin doses and "basically had [him] stop cholesterol and add a blood, like high blood pressure medicine, nausea medicines,[] certain medicines that tried to cure what [he] was talking about every time Plaintiff went to visit [Dr. Fernandez]." (AR 101).

Plaintiff also testified that he had been having headaches and suffering from nausea every day for the past several months. (AR 101-102). He also testified that he bleeds "every once in a while" due to a diverticulitis of the colon. (AR 105).

\\
\\
\\
\\

14

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so,

15

the claimant is found disabled.  If not, proceed
to step four.

(4)  Is the claimant capable of performing his past
work? If so, the claimant is found not disabled.
If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If
not, the claimant is found disabled.  If so, the
claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20
C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through
four and the Commissioner has the burden of proof at step five.
Bustamante, 262 F.3d at 953-54.  Additionally, the ALJ has an
affirmative duty to assist the claimant in developing the record
at every step of the inquiry.  Id. at 954.  If, at step four, the
claimant meets his burden of establishing an inability to perform
past work, the Commissioner must show that the claimant can
perform some other work that exists in "significant numbers" in
the national economy, taking into account the claimant's RFC,
age, education, and work experience.  Tackett, 180 F.3d at 1098,
1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1),
416.920(g)(1).  The Commissioner may do so by the testimony of a
vocational expert or by reference to the Medical-Vocational
Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2
(commonly known as "the grids").  Osenbrock v. Apfel, 240 F.3d

1157, 1162 (9th Cir. 2001).   When a claimant has exertional
(strength-related) and non-exertional limitations, the Grids are
inapplicable and the ALJ must take the testimony of a vocational
expert.   Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000)
(citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process
and concluded that Plaintiff was not disabled within the meaning
of the Social Security Act.   (AR 39).   At step one, the ALJ found
that Plaintiff had not engaged in substantial gainful activity
since August 28, 2008.   (AR 22).

At step two, the ALJ found that Plaintiff had the severe
impairments of a history of two aortic valve replacements,
transient ischemic attack, degenerative changes of the lower
thoracic and lumbar spine, and asthma.   (AR 22-23).   However, the
ALJ determined that Plaintiff's diverticulitis, gall bladder
polyp, and chronic headaches, while medically determinable, did
not establish severe impairment.[3]   (AR 23-24).   Moreover, the ALJ
concluded that Plaintiff did not establish anxiety at a level
that would reasonably cause more than minimal functional
limitations.   (AR 24-25).   The ALJ also concluded that

---

[3] A physical or mental impairment is considered "severe" if it
"significantly limits [the claimant's] physical or mental ability
to do basic work activities."  20 C.F.R. § 404.1520.

17

Plaintiff's potential alcohol abuse, diarrhea caused by "likely acute gastroenteritis," nausea, body habitus, prior avulsion injury to the left distal interphalageal joint, rheumatoid arthritis, small hiatal hernia, and pain in the elbow, knee, groin, neck, shoulders, and back were not medically determinable impairments for Social Security purposes.[4]  (AR 26-28).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1).  (AR 68).  The ALJ found that:

> [Plaintiff] has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six out of eight hours (with normal breaks), and sit for six hours in an eight-hour work day (with normal breaks). He can occasionally climb ladders, ropes, scaffolds, ramps, and stairs.  He can occasionally balance, crouch and crawl.  He must avoid concentrated exposure to fumes, odors, dust, gases, and other similar environmental pollutants.  He cannot understand, remember, and carry out complex instructions, but has no limitations with simple and detailed instructions.  This is a limited range of light work as defined in 20 C.F.R. § 404.1567(b).

(AR 28-29).  In reaching this conclusion, the ALJ stated that he had considered all of the Plaintiff's symptoms and the extent to which they could "reasonably be accepted as consistent with the

---

[4]  A medically determinable impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory techniques.  20 C.F.R. § 404.1508.  In addition, the impairment must last or be expected to last for at least twelve consecutive months.  20 C.F.R. § 404.1509.

objective medical evidence and other evidence." (AR 29). He also considered opinion evidence. (Id.). The ALJ did not find Plaintiff's subjective allegations credible to the extent that Plaintiff was as limited as he said he was.[5] (AR 36). Furthermore, the ALJ stated that Dr. Fernandez's medical opinions do not merit substantial weight due to inconsistencies among some of the doctor's assessments, descriptions of symptoms and chart notes.[6] (Id.).

At step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work as defined by 20 C.F.R. § 404.1565. (AR 37). At step five, however, based upon the testimony of the VE and considering Plaintiff's age, education, work experience and RFC, the ALJ opined that Plaintiff could perform jobs that existed in significant numbers in the national economy, including light, unskilled work as a small products assembler, bonding machine operator, or nuts and bolts assembler. \\

_____

[5] The ALJ stated that Plaintiff "is well compensated following the 2008 surgery; he has no residual effects from his TIA; his back complaints are not attended by significant findings or treatment; his treatment history has been fairly routine since 2008; his alleged onset date of disability does not relate to medical disability; he returned to work in 2011 and was laid off for no medical reasons related to full time work; he collected unemployment thereby holding himself out as ready, willing and able to work; and h[a]s relatively full activities of daily living." (AR 35).

[6] The ALJ concluded that Dr. Fernandez's opinions "are not well supported by the overall record and are inconsistent with the opinions of the consultative internist and the Disability Determination Service (DDS) medical consultants . . . [Thus] it does not merit controlling weight." (AR 36).

1 (AR 38). In sum, the ALJ found that Plaintiff was not disabled.

2 (Id.).

3

4 **VI.**

5 **STANDARD OF REVIEW**

6

7 Under 42 U.S.C. § 405(g), a district court may review the

8 Commissioner's decision to deny benefits. "The court may set

9 aside the Commissioner's decision when the ALJ's findings are

10 based on legal error or are not supported by substantial evidence

11 in the record as a whole." Aukland v. Massanari, 257 F.3d 1033,

12 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen

13 v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.

14 Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

15

16 "Substantial evidence is more than a scintilla, but less

17 than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson

18 v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant

19 evidence which a reasonable person might accept as adequate to

20 support a conclusion." Id. To determine whether substantial

21 evidence supports a finding, the court must "'consider the record

22 as a whole, weighing both evidence that supports and evidence

23 that detracts from the [Commissioner's] conclusion.'" Aukland,

24 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th

25 Cir. 1993)). If the evidence can reasonably support either

26 affirming or reversing that conclusion, the court may not

27 substitute its judgment for that of the Commissioner. Reddick,

28 \\

157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds. Plaintiff asserts that the ALJ erred in failing to give appropriate weight to the opinion of his treating physician, Dr. Fernandez. (Memorandum in Support of Plaintiff's Complaint ("MSC"), Dkt. No. 17, at 4). Specifically, Plaintiff asserts that the ALJ failed to provide specific and legitimate reasons for discounting the treating physician's opinions. (MSC at 4).

In addition, Plaintiff contends that the ALJ erred in his determination of Plaintiff's residual functional capacity and finding that Plaintiff can perform other work. (Id. at 11). Plaintiff asserted that he could stand and walk for slightly less than two hours only and thus would not be able to perform the full range of light work that the VE testified Plaintiff would be able to perform with his limitations. (Id. at 11-12).

Finally, Plaintiff asserts that the ALJ erred in rejecting Plaintiff's subjective pain testimony. (Id. at 7). Plaintiff contends that the limited times he generally reported feeling well do not invalidate the numerous instances when he complained of significant pain and other problems, including his subjective symptoms from headaches. (Id.). Because the Court finds other

grounds require remand, it is unnecessary for the Court to reach Plaintiff's contentions regarding the ALJ's credibility determination. For the reasons discussed below, the ALJ's Decision is REVERSED and REMANDED.

## A. The ALJ Failed To Provide Specific and Legitimate Reasons To Reject The Treating Physician's Opinions

Social Security regulations require the Agency to "evaluate every medical opinion [it] receive[s]," giving more weight to evidence from a claimant's treating physician. 20 C.F.R. § 404.1527(c). Where the Agency finds the treating physician's opinion of the nature and severity of the claimant's impairments well-supported by accepted medical techniques and consistent with the other substantive evidence in the record, that opinion is ordinarily controlling.[7] 20 C.F.R. § 404.1527(c)(2); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). See also Garrison, 759 F.3d at 1012 (citing Orn) (even when contradicted, treating or examining physician's opinion is owed deference, and often the "greatest" weight). The Agency must give "good reasons" for the weight given to a treating source's opinions, including where not

---

[7]   Generally, there are three types of physicians: (1) treating physicians, who examine and treat, (2) examining physicians, who examine but do not treat, and (3) non-examining physicians, who neither examine nor treat. Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009). The opinions of treating physicians are given the greatest weight because treating physicians are "employed to cure and [have] a greater opportunity to know and observe the patient as an individual." Benton v. Barnhart, 331 F.3d 1030, 1038 (9th Cir. 2003).

1  given controlling weight.  20 C.F.R. § 404.1527(c)(2); <u>Garrison</u>

2  <u>v. Colvin</u>, 759 F.3d 1012 n.11 (9th Cir. 2014).  "[A]n ALJ errs

3  when he rejects a medical opinion or assigns it little weight

4  while doing nothing more than ignoring it, asserting without

5  explanation that another medical opinion is more persuasive, or

6  criticizing it with boilerplate language that fails to offer a

7  substantive basis for his conclusion."  <u>Garrison</u>, 759 F.3d at

8  1012-13.  Moreover, an ALJ must give "specific and legitimate"

9  reasons for rejecting the findings of treating or examining

10 physicians.  <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th Cir.

11 1995).

12

13    Here, the ALJ stated that he does not give the opinions of

14 Plaintiff's treating physician, Dr. Fernandez, significant weight

15 because the doctor indicated different limitations depending on

16 the questionnaire he was provided to complete.  (AR 36).  The

17 slight variations between the doctor's forms, however, are due to

18 the fact that the forms consider different conditions, such as

19 Plaintiff's cardiac condition, (AR 493-497), lumbar condition,

20 (AR 489-492), neurological function, (AR 355-358) and TIAs, (AR

21 498-501).  (<u>See</u> MSC at 4).  Additionally, the forms were

22 completed months and years apart, so Plaintiff's condition could

23 have changed during those periods.  As such, it is reasonable

24 that each specific condition that would cause differing

25 limitations and symptoms would improve or deteriorate at varying

26 times.  Thus, the Court finds that this particular reason for

27 rejecting Dr. Fernandez's opinions is not a legitimate reason.

28

1    The ALJ also found that Dr. Fernandez's opinions are not
2    consistent with the opinion of the consultative examiner and non-
3    examining State Agency physicians. (AR 36). However, while the
4    consultative examining physician, Dr. Wallack, stated that he
5    reviewed extensive records, he noted only one record that states
6    Plaintiff had an episode of bleeding from the ear and did not
7    note Plaintiff's numerous other visits to the doctor or urgent
8    care for extensive bleeding. (AR 295, 298, 299, 404, 467, 514).
9    Dr. Wallack also failed to discuss Plaintiff's difficulty
10   controlling his Coumadin levels and his difficulty with fatigue
11   and shortness of breath. (MSC at 7). Thus, it does not appear
12   that Dr. Wallack's opinion was a legitimate reason for rejecting
13   Dr. Fernandez's opinions, as Dr. Wallack did not base his opinion
14   on the evidence as a whole. Accordingly, the Court concludes
15   that the ALJ failed to provide specific and legitimate reasons,
16   supported by the record, to reject the treating physician's
17   opinion.

18
19   **B.    The ALJ Erred At Step Five Because The Hypothetical Did Not**
20   **Accurately Reflect Plaintiff's Limitations**

21
22       The ALJ found that, based on the ALJ's RFC conclusions, the
23   VE testified that an individual with these limitations would be
24   able to perform the jobs of assembler-small products, bonding
25   machine operator and nut and bolt assembler. (AR 38). The ALJ's
26   RFC included an ability to "stand and/or walk for six out of
27   eight hours with normal breaks." (AR 28). The ALJ's RFC was
28   consistent with a limited range of light work. (AR 29). The ALJ

24

stated that he gave substantial weight to Dr. Wallack's opinion as well as to the DDS medical consultants. (AR 37). The ALJ also stated that the DDS medical consultants found that Plaintiff could stand or walk for six out of eight hours and "[t]his opinion was affirmed on reconsideration." However, the ALJ neglected to note that on reconsideration, the DDS consultant concluded that Plaintiff could stand for only "slightly less than 2 hours" per day. (AR 151). The ALJ did not reconcile this conflict in the record.

SSR 83-10 states that light work requires frequent lifting of ten pounds, and since "frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251 at *5-*6 (Jan. 1, 1983). Plaintiff could stand for only slightly less than two hours. Thus, he would not be able to perform the full range of light work. It is unclear how this limitation would have impacted the VE's testimony, if it had been included in the hypothetical.[8] (See id.).

---

[8] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. SSR 83-10, 1983 WL 31251 at *5 (Jan. 1, 1983). Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. (Id.). Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. (Id.). By its very nature, work performed primarily in a seated position entails no significant stooping. (Id.). Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. (Id.). "Occasionally" means occurring from very little up to one-third of the time. (Id.). Because being on one's feet is required "occasionally" at the

Omission of a claimed impairment or limitation from the RFC hypothetical must be based on specific findings and an explanatory rationale.  See Light v. SSA, 119 F.3d 789, 793 (9th Cir. 1997).  Hypothetical questions are incomplete if they omit mental impairments, restrictions, or symptoms presented through competent evidence.  Nguyen V. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  If the hypothetical does not reflect all of claimant's limitations, the Ninth Circuit has held the expert's testimony has no evidentiary value.  Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988) (rejecting hypothetical that did not include all limitations supported by record, including standing limitation).  Because the hypothetical did not accurately reflect Plaintiff's limitations, remand is required.

**C.   The ALJ Erred at Step Two By Failing to Consider All The Medical Evidence In Determining Whether Plaintiff's Chronic Headaches Are A Severe Impairment**

Plaintiff raised the ALJ's failure to consider certain impairments as an attack on the ALJ's credibility finding.  While the Court finds it unnecessary to reach this argument, it nevertheless addresses the ALJ's finding that Plaintiff's headaches were a non-severe impairment so that the ALJ may consider this evidence on re-evaluation and remand.

---

sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.  (Id.).  Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.  (Id.).

1       At step two of the sequential evaluation, the ALJ must
2   determine whether the claimant has a severe impairment or
3   combination of impairments significantly limiting her from
4   performing basic work activities.  20 C.F.R. § 404.1520(c).  The
5   step-two inquiry regarding severity of an impairment is a <u>de</u>
6   <u>minimis</u> screening device to dispose of groundless claims.  <u>Smolen</u>
7   <u>v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996).  An impairment or
8   combination of impairments can be found "not severe" only if the
9   evidence establishes a slight abnormality that has "no more than
10  a minimal effect on an individual's ability to work."  (<u>Id.</u>).

11

12      Here, the ALJ failed to include Plaintiff's headaches as
13  severe impairments at step two of the sequential evaluation
14  process.  Plaintiff's medical records are replete with references
15  to his headaches.  (AR 290, 291, 292, 296, 297, 298, 302, 304,
16  305, 337, 341, 366, 370, 376, 380, 381, 383).  Plaintiff
17  testified about the headaches at the hearing before the ALJ.  (AR
18  23-24).  Since Plaintiff's disability onset date, he "get[s] bad
19  headaches for days."  (AR 249).  This evidence satisfies the "<u>de</u>
20  <u>minimis</u>" showing at step two and requires that Plaintiff's
21  headaches be considered a "severe impairment."

22

23      The ALJ stated that he found Plaintiff's headaches non-
24  severe because of the "longitudinal record."  (AR 24).  Although
25  he notes Plaintiff's numerous complaints of headaches outlined in
26  the record, he rejects a finding of severity based on one six-
27  month gap in the medical records during which headache symptoms

28

were not reported or recorded.[9]   (AR 24).   However, the ALJ appears not to have considered that a claimant's condition can wax and wane over time and can vary in intensity.   SSR 96-7P, 1996 WL 374186 at *5 (Jul. 7, 1996).   Periods of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months and to treat them as a basis for invalidating severity of claimant's symptoms. (Id.).

In finding Plaintiff's headaches "non-severe," the ALJ also notes that Plaintiff was not referred to a headache specialist and requires only over-the-counter medication.   (AR 64). However, the Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to rest periodically or take medication.   Garrison, 759 F.3d at 1016 (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).   Plaintiff testified that he was once laid off because he "basically couldn't maintain almost an 8 hour period . . . [but the company] kept basically a handful which would work nonstop."   (AR 87).   Even when doing household chores, Plaintiff requires periods of rest or naps ranging from thirty

---

[9]   The ALJ states, "after April 2011, there is no assessment of headaches until October 2011; at that time, claimant complained of headaches related to stress, and . . . currently takes over-the-counter Tylenol for headaches."   (AR 64).

minutes to two hours.[10]   (AR 251).   According to Plaintiff, his constant headaches, in combination with the other conditions he suffers from, significantly impact his ability to work.   (AR 93, 101-102).   Upon remand, the ALJ must re-do the sequential evaluation incorporating headaches as a severe impairment.

## VIII.
## CONCLUSION

For the foregoing reasons, IT IS ORDERED that Judgment be entered REVERSING the decision of the Commissioner and REMANDING this case for further proceedings, consistent with this decision.

DATED:  December 23, 2015

```
                               /S/
                               _____
                               SUZANNE H. SEGAL
                               UNITED STATES MAGISTRATE JUDGE
```

## NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS/NEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**

---

[10]  Plaintiff's chores include lifting groceries and a laundry basket once a week, lifting household trash twice a week, cutting the grass and pulling weeds for about two hours, sweeping and vacuuming for thirty minutes, washing dishes for fifteen minutes and making his bed in ten minutes although he could "no longer lift the mattress and change the sheets."   (AR 249-251). Plaintiff notes that he is able to perform those chores because he "limit[s] what [he] do[es]."   (AR 251).